## OBER & SONS COMPANY *v.* COCHRAN, receiver.

The mere fact that a bank to which a note was sent for collection, with instructions to immediately remit the proceeds of the collection to the owner, collected the money due on the note and, instead of obeying instructions, used the same in its own business, is not sufficient, upon its insolvency, to impress a fund realized by its receiver, by converting its assets into cash, with a trust for the payment of the money so collected and used.

Argued June 3,—Decided August 12, 1903.

Equitable petition. Before Judge Reagan. Pike superior court. October 10, 1902.

*Hall & Wimberly*, for plaintiffs.
*Allen & Tisinger*, for defendant.

FISH, P. J.   G. Ober & Sons Company held a note on P. F. Matthews, of Pike county, for $506, which fell due on November 1, 1901; and, on October 14, 1901, sent his note to the New South Savings Bank, of Barnesville, Ga., for collection and remittance of the proceeds.   On November 21, 1901, the bank collected the amount due on the note from Matthews.   The bank never remitted the amount so collected to the Ober Company, but used the same in its own business.   On December 4, 1901, the bank failed. Upon the application of creditors, its assets were placed in the hands of a receiver.   The Ober Company filed a petition against the receiver, in which, after setting up the facts in reference to its claim against the bank, it alleged that it was not a creditor in the sense that it had extended credit to it, either by making a deposit or by a loan of money, or otherwise; that the money collected from Matthews was the property of the petitioner, and not an asset of the bank.   The petitioner prayed for an order requiring the receiver to pay over to it the amount so collected.   The receiver alleged in his answer that when he took charge of the bank he found only $29.52 in its vaults.   He denied that the petitioner had any superior lien on the funds in his hands.   The case came on to be tried at the October term of Pike superior court.   The petitioner proved the facts which it had alleged in its petition, but made no effort to trace the money collected upon the Matthews note into any fund or property which went into the hands of the receiver. The court held that, under these facts, the Ober Company was not entitled to an equitable lien on the funds in the hands of the receiver as against the general creditors of the bank; to which judgment the petitioner excepted.

Under the facts alleged and established by the evidence, did the petitioner have an equitable lien upon the assets of the bank in the hands of the receiver ?   We think not.   Under the ancient rule, the equitable right to follow and recover property misapplied by one holding it in trust for another depended upon the ability of the owner to identify it, the equity attaching only to the property itself.   Subsequently the rule was extended, so that the equitable right would attach to the proceeds of the property, to whatever was obtained in exchange for it, the rule, as stated by Lord Ellen-

borough, in Taylor *v.* Plumer, 3 M. & S. 575, being that " The product or substitute for the original thing still follows the nature of the thing itself so long as it can be ascertained to be such." But if there were no means of tracing and identifying the specific property or its proceeds, the equitable right of the owner was lost. So that if a trust fund became mingled and confused with other funds, it could not be separated and recovered by the person injured by the misappropriation. Since the decision in the celebrated English case of Knatchbull *v.* Hallett, L. R. 13 Ch. Div. 696, wherein Master of the Rolls Jessel laid down what he called "the modern doctrine of equity," the rule has been given a somewhat wider scope in England and in those jurisdictions in this country where the decision in that case has been followed. Indeed, in some of the American cases which have been decided since this leading English case, the courts have gone much farther than the principle there laid down seems to authorize. In that case it was held: " If money held by a person in a fiduciary character, though not as trustee, has been paid by him to his account at his bankers, the person for whom he held the money can follow it, and have a charge on the balance in the bankers' hands." The facts of the case, as stated by the master of the rolls, showed that Mrs. Cotterrill had deposited certain bonds with Mr. Hallett for safe custody, and he was in the habit of receiving the income from the bonds for her. Hallett improperly sold the bonds and put the money received to his general account at his bankers. Sir George Jessel said : " It is not disputed that the money remained at his bankers mixed with his own money at the time of his death ; that is, he had not drawn out that money from his bankers. In that position of matters Mrs. Cotterrill claimed to be entitled to receive the proceeds, or the amount of the proceeds, of the bonds out of the money in the hands of Mr. Hallett's bankers at the time of his death, and that claim was allowed by the learned judge of the court below, and I think was properly so allowed." The ruling of the court made Mrs. Hallett's claim a charge upon the fund in the bankers' hands with which her money, received from the sale of her bonds, had been mingled by her agent and bailee. The court proceeded upon the theory that a trustee who deposits trust funds, together with funds of his own, to his own account at his bankers, and then draws, for his own purposes, from this fund, leaving a bal-

ance sufficient to cover the trust fund, is to be presumed to have drawn out his own money in preference to the trust money.    The master of the rolls likened the facts of the case to a trustee putting one thousand sovereigns of trust money in a bag and then placing in the same receptacle a sovereign of his own; and then said: " Could anybody suppose that a judge in equity would find any difficulty in saying that the cestui que trust has a right to take 1000 sovereigns out of that bag ?    I have no doubt of it."    He further said it would make no difference if, instead of one sovereign, it was another one thousand sovereigns of his own which the trustee placed in the bag.    But we apprehend that if at the time the effort was made to recover the trust funds they could be traced no further than into the bag and the bag was then empty, — the trustee having spent all the sovereigns which he had put in it, — the trust fund, even under the principle laid down in that case, would be lost, and the cestui que trust could not, as against general creditors of the trustee, take from the assets of his estate an amount sufficient to replace it.

In the case which we have under consideration, the bank was the agent of the Ober Company, and, as such agent, collected something over five hundred dollars, which it used in its business, and then failed and its assets were placed in the hands of a receiver; and the claim of the Ober Company is that, notwithstanding its failure to trace the money so collected into any property or fund which went into the hands of the receiver, it has the right to take from a fund which was not on hand when the bank failed, but which has been realized by the receiver by converting the bank's assets into cash, an amount equal to that which the bank so collected and spent.    There is nothing in the noted English decision which sustains this contention, and it is contrary to the well-established principle applicable to cases of the present character and to the great weight of authority upon the subject.    In order to recover a trust fund which has been misapplied by the trustee, or person holding it in a fiduciary character, it must be clearly identified or distinctly traced into the property, fund, or chose in action which is to be made subject to replace it.    When the trust fund has been dissipated and can be traced no further than into the hands of the trustee, or agent who held it in trust, the fund is lost, and he who was its owner stands upon no better footing than a general creditor,

when the assets of the trustee or agent are being distributed by a court of equity.    It is a wide and dangerous stretch of the equitable doctrine applicable to the tracing and recovering of trust funds to say that it is not necessary to trace the funds into any specific property or chose in action, but that if it can be shown that the funds somehow, in some unexplained way, went into the business of the trustee, all of his assets are forthwith impressed with the trust.    Even upon the theory adopted by some courts that the tracing of the trust fund into the estate of the trustee is sufficient, it is difficult to see how mere proof that the trustee has used the fund in his own business is sufficient to show that it has gone into and, in some form, is a part of his estate.    He may have made a bad investment with it and lost it completely.  He may have paid debts with it; in which event the liabilities of his estate will have been decreased, but nothing will have gone into his assets as the representative or substitute for the fund so used.

In support of the contention that the Ober Company is entitled to an equitable lien upon the fund collected by the receiver of the insolvent bank, the able and industrious counsel for the plaintiff in error cite a number of cases, among which is McLeod *v.* Evans, 66 Wis. 401, cited from 28 N. W. 173, where the principle for which counsel contend was first clearly formulated and announced. In that case Coyle, C. J., said:  " We do not understand that it is necessary to trace the trust fund into some specific property in order to enforce the trust.    If it can be traced into the estate of the defaulting agent or trustee it is sufficient."   This has been regarded and followed by some of the courts of this country as the leading case upon " the modern doctrine of equity " in reference to tracing and reclaiming trust funds.   In giving the reason upon which the ruling of the court was based, the learned Chief Justice said : " The conclusion is irresistible, from the facts, that the proceeds of the trust property found its way into Hodges' hands, and were used by him either to pay off his debts or to increase his assets. In either case, it would go to the benefit of his estate.    It is not to be supposed the trust fund was dissipated and lost altogether, and did not fall into the mass of the assignor's property ; and the rule in equity is well established that so long as trust property can be traced and followed into other property into which it has been converted, that remains subject to the trust."    Cassoday, J., with

whom Taylor, J., concurred, vigorously dissented from the judgment of the court, and, in reply to the reasoning of the majority, said: "It is probable, as claimed, that the draft, or the proceeds of it, were used by Hodges prior to the assignment in payment of some of his debts. But this would in no way swell the volume or value of his *assets* which went into the hands of the assignee. It would merely diminish the amount of his indebtedness to the extent of such payment. That would, in a general way, benefit the estate to the extent that it increased the per cent. that the other creditors would in consequence receive. But as this estate is badly insolvent, the aggregate amount of such increase would necessarily be very much less than the amount of the draft. The amount of the equitable charge upon the assets ought not, upon any principle of equity, to exceed the amount of the benefit to the estate derived by the draft or its proceeds." Chief Justice Corliss, in Northern Dakota Elevator Co. *v.* Clark, 3 N. D. 30–31, disposes of the line of argument adopted by the majority of the Wisconsin court, and some other courts which have rendered similar decisions, in the following convincing manner: "A new doctrine has sprung up in recent days. It goes upon the theory of the enrichment of the estate out of which priority is sought to be secured. This would entitle every general creditor to preference, and therefore there would be no preferences as between such creditors and the person whose property, without his consent, had enriched the estate. Reasoning along this line, we would have a preference in favor of general creditors as against one who by a tort had caused a liability against his estate without enriching it, as in case of assault and battery, libel, slander, seduction, or malicious prosecution. But no such preference exists; nor can it exist." On the same line, Mr. Justice Jackson, in Bank *v.* Armstrong, 39 Fed. 693, said: "No well-considered case has gone to the extent of holding that when an agent converts or misappropriates his principal's property or fund, and thereafter fails, his general estate will be impressed with a trust for the reimbursement of such principal on the ground that such estate has been benefited, and to an equal amount, by the agent's breach of duty. Every creditor could rest a like claim to priority of satisfaction on the same ground. The right of the owner to follow and recover his property rests upon a principle altogether different. He can only recover such

portion or proceeds as can be traced into the hands of the receiver in its original form or in some substitute form."

The decision in McLeod *v.* Evans has met with much adverse criticism by other courts and by writers upon legal topics, who have regarded it as a dangerous and unauthorized departure from established and correct equitable principles, and has been, together with the two other Wisconsin cases which followed it, expressly overruled.    The reviewing and overruling decision was rendered in Nonotuck Silk Co. *v.* Flanders, 87 Wis. 237, where the court held: "One for whom a banker had collected a draft before making a voluntary assignment is not entitled to a preference over other creditors if the proceeds of such collection were disposed of by the banker prior to the assignment, so that no part thereof came in any form to the hands of the assignee.    McLeod *v.* Evans, 66 Wis. 401, Francis *v.* Evans, 69 Id. 115, and Bowers *v.* Evans, 71 Id. 133, so far as they conflict herewith, overruled."[*]    Carley *v.* Graves, 85 Mich. 483, cited by counsel from 78 N. W. 710, distinctly followed McLeod *v.* Evans, which the court said covered the principle to be applied to the case which it had under consideration.    In a later Michigan case, the decision in which does not throw much light upon the subject which we have under consideration, the court, in discussing the right to follow trust funds, after citing cases holding that there must be a tracing or identification of the fund, said: "But in all these cases it is held that the fund must be clearly traced into the hands of the person sought to be charged, and that if the trust property does not remain, but has been made way with by the trustee, the *cestuis que trustent* have no longer any specific remedy against any part of his estate in his insolvency, but they must come in pari passu with the other creditors, and prove against the trustee's estate for the amount due them. This rule has been as steadily adhered to by the courts both of this country and of England as any rule which has ever been adopted for the protection of the general creditors of a bankrupt or of an insolvent."    Sherwood *v.* Milford State Bank, 94 Mich. 81.    The case of People *v.* City Bank of Rochester, 96 N. Y. 32, which is cited by counsel, and which has been construed by some of the courts as being in line with McLeod *v.* Evans, is not so considered by the Court of Appeals of New York.    In Matter of Cavin *v.* Gleason, 105 N. Y. 256, it was held: "Upon an accounting in bankruptcy

or insolvency, a trust creditor is not entitled to preference over general creditors of the insolvent merely on the ground of the nature of the claim. To authorize such a preference some specific recognized equity founded on some agreement, or relation of the debt to the assigned property, must be shown, which entitles the claimant, according to equitable principles, to preferential payment. To entitle the trust creditor to such a preference, it must at least be made to appear that the fund or property of the insolvent, remaining for distribution, includes proceeds of the trust estate." The court further said : "The case of People v. City Bank of Rochester (96 N. Y. 32) seems to have been misunderstood. The question considered in this case was not raised there, and it was not claimed in that case that the proceeds of the checks of Sartwell, Hough & Co., the petitioners, had not gone into the general funds of the bank, or that they had not passed in some form to the receiver. The court did not decide that the petitioners would have been entitled to a preference in case the proceeds of the check had been used by the bank and were not represented in its assets in the hands of the receiver." In Holmes v. Gilman, 138 N. Y. 369, Peckham, J., who delivered the opinion, speaking of the right to follow a trust fund, said: "The right has its basis in the right of property, and the court proceeds on the principle that the title has not been affected by the change made of the trust funds, and the cestui que trust has his option to claim the property and its increased value as representing the original fund. The right to follow and appropriate ceases only when the means of ascertainment fail. It is a question of title."

It seems to us that the courts which, in our opinion, have enlarged the equitable doctrine applicable to cases of the present character to an unreasonable extent, have lost sight of this basic idea of equitable title to the property into which the trust funds are traced, that is, title to the extent that such funds have entered into such property. The other cases cited by counsel for plaintiff in error are : Thompson v. Gloucester City Savings Inst., 8 Atl. 97, a case decided by the Court of Chancery of New Jersey ; Griffin v. Chase, 36 Neb. 328, 54 N. W. 572 ; Peak v. Ellicott, 30 Kas. 156, 90 Am. Rep. 90 ; People v. Bank of Dansville, 39 Hun, 187 ; First National Bank v. Sanford, 62 Mo. App. 394, and Germania Fire Ins. Co. v. Kimble, 66 Mo. App. 370. These cases tend to sup-

port the contention of the plaintiff in error, especially the two Missouri cases, which are directly in point. In the first of these Missouri cases, the court, referring to the reasoning in Harrison *v.* Smith, 83 Mo. 210, the decision in which was considered controlling, said: "We concede that this reasoning proceeds on advanced lines, and is seemingly opposed to the weight of authority in other States." In our investigation of the subject, we have found some other cases which are in line with these, but, for the reasons which we have given, we do not consider any of them sound. In an elaborate monographic note to Sayles *v.* Cox, 32 L. R. A. 719, it is said: "The general rule, where the bank has completed the collection and mixed the funds with its own, is that the bank is no longer a trustee but simply a debtor, and that the owner of the paper can not claim a preference out of its assets." In that case the Supreme Court of Tennessee held: "The fraud of a bank in receiving a note for collection when insolvent will not alter the rule that collections made under directions to remit 'by draft' will not be impressed with a trust giving a preferential claim against the bank's assets."

In Merchants' Bank *v.* Austin, 48 Fed. 31, it was held, that a bank which collects a draft sent it for that purpose, with directions to remit the proceeds to another bank for the owner's account, does not thereby become a trustee, so that the fund can be followed into the hands of a receiver, although it had become mixed with other cash of the bank before his appointment; "especially when it appears that the business was carried on, and money paid out, for several days after the collection was probably made." In Philadelphia National Bank *v.* Dowd, 38 Fed. 172, 2 L. R. A. 480, it was held, that if a paper is sent to a bank for collection and immediate remittance, but the collecting agent, instead of obeying instructions, collects the money due on the paper and mingles it with its own funds before it closes its doors, the fund so collected can not be followed, but the collecting agent is merely a general debtor of the owner of the paper. In that case there is a fine and full discussion of the subject and the cases pro and con by Judge Seymour. To the same effect as the case just cited is Bank of Commerce *v.* Russell, 2 Dill. 215. The Supreme Court of Alabama held: "The mere fact that a bank, as agent, has converted to its own use the money of its principal, which it failed to account for,

and commingled it with its own money, or in some form with its other assets, so that it can not be identified, or the specific uses to which it was applied traced, is not sufficient, on a bank becoming insolvent, to impress the general assets of said bank with a trust for the payment of the money so collected and used." Similar rulings were made in Anheuser-Busch Brewing Association v. Clayton, 56 Fed. 759, 6 C. C. A. 108; Edson v. Angell, 58 Mich. 336; Ill. Trust & Savings Bank v. First Nat. Bank, 15 Fed. 858; Spokane County v. First National Bank, 68 Fed. 979; Ferchen v. Arndt, 26 Or. 121; Muhlenberg v. Northwest Loan Co., Ib. 132; Thompson's Appeal, 22 Pa. St. 16; Union Bank of Chicago v. Goetz, 138 Ill. 127; Englar v. Offutt, 70 Md. 78; Steamboat Co. v. Locke, 73 Me. 370; Lathrop v. Bampton, 31 Cal. 17; Little v. Chadwick, 151 Mass. 109; Neely v. Rood, 54 Mich. 134; Shields v. Thomas (Miss.), 14 So. 84.

The case of *Tiedeman* v. *Imperial Fertilizer Co.*, 109 *Ga.* 661, is on its facts closely analogous to the present case, and the decision there rendered would be conclusive of the question which we have had under consideration, but for the fact that the equitable doctrine in reference to the tracing and recovering of trust funds, or funds held in a fiduciary character, seems to have been only incidentally dealt with, the case turning mainly upon the question whether the parties claiming the equitable liens upon the assets of their insolvent bailees were entitled to such liens under certain sections of the Civil Code, upon which they relied to support their contentions. It was there held: "Where the owner of notes placed the same in the hands of another for collection, and the bailee, having made collections, failed to remit the proceeds, the claim of the owner of the money collected was, in a general sense, in the nature of a fiduciary debt, but not such an one as entitled him to a priority over the claims of general creditors in the distribution of the assets of the bailee who had become insolvent." In the course of the opinion, however, Mr. Justice Little made some observations which are directly applicable to the question involved in this case. He said: "A trust may arise in different ways. If one uses the funds of another in the purchase of property, taking title thereto in his own name, as a general rule it will be held that the purchaser holds the property thus acquired, in trust for the benefit of the owner of the funds. Such is known as a resulting trust, which is

sometimes spoken of as an equitable lien, and while it is, the lien extends no further than the property acquired with the money of the other. Such a lien can only be enforced against the specific property in which the funds were invested." He further said that the facts created an agency, and that the principals could have recovered a judgment against the agents for the money collected, "in a suit as for a debt, or, had they been able to identify the particular funds, separate and apart, they could have recovered the specific funds."

The trial court correctly held that the petitioners were not entitled to an equitable lien upon the assets in the hands of the receiver of the insolvent bank. *Judgment affirmed. By five Justices.*